Filed 12/5/14  Zanich v. Zuckerman CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARILEEN ZANKICH, | B247274 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. VP009145) |
| v. | |
| CARILEEN ZUCKERMAN et al., | |
| Defendants, Cross-complainants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Daniel S. Murphy, Judge.  Affirmed.

Kent M. Bridwell for Plaintiff, Cross-defendant and Appellant Marileen Zankich.

Law Office of Miller & Angevine and Elizabethanne Miller Angevine for Respondent Carileen Zuckerman; Carolyn Dunnum Sloan for Respondent Jeanette Bjerken; Noelle Michelle Tomp for Respondent Ronald Osinga.

_____

This matter stems from a dispute among the four children of Wilhelmina[1] Osinga – Marileen Zankich, Jeanette Bjerken (Jan), Ronald Osinga (Ron), and Carileen Zuckerman—over the distribution of assets from Wilhelmina's trust after her death. Among other things, Marileen filed a petition seeking forfeiture of and surcharge on her siblings' share of the trust assets on the grounds of elder abuse and breach of fiduciary duty. The probate court found Marileen's petition to be filed in bad faith. It awarded attorney fees and costs associated with defending the petition to Jan, Ron, and Carileen, to be charged against Marileen's future distributions from the trust. Marileen challenges the probate court's attorney fee award, contending that substantial evidence does not support its findings. We affirm.

## FACTS

All four siblings were actively involved in Wilhelmina's care prior to her death. In 2000, Wilhelmina was 81 years old and living at home with her grandson, Eric, who is Jan's son. In early 2000, Marileen became estranged from the rest of her siblings. According to Marileen, Wilhelmina "asked [Marileen] to help her because she said [Jan] wanted to take her to a lawyer and have everything signed over, and . . .when I confronted [Jan] with it, she just wouldn't speak to me anymore about it." On August 16, 2000, Wilhelmina established a revocable trust, which divided her estate equally among her children upon her death. Wilhelmina also set up a durable power of attorney, naming Jan as her attorney-in-fact, and a health care directive pursuant to Health and Safety Code section 7186.5.[2] In the health care directive, Wilhelmina certified she was of sound mind and willfully and voluntarily declared that she did not want her life artificially prolonged

---

[1] For ease of reference and with all due respect, we will refer to each of the Osinga family members by their first names.

[2] Section 7186.5 related to the execution of a declaration concerning life-sustaining treatment. It was repealed operative July 1, 2000 and revised and recast as part of a new act, the Health Care Decisions Law (Probate Code, § 4600, et al). (Assem. Bill No. 891 (1999 Reg. Sess.) § 39.)

2

should she have an incurable and irreversible condition diagnosed by two physicians that would result in her death within a relatively short period of time.

On August 8, 2001, Wilhelmina was admitted to Long Beach Memorial Hospital and was diagnosed with acute onset Alzheimer's. She was discharged from the hospital on August 24 and immediately moved into Park Vista, a skilled nursing facility. Although Marileen was neither informed nor consulted about the move, she agreed that it was best for Wilhelmina. Marileen was pleased with the care Wilhelmina received at Park Vista, where she was housed in a locked facility and had a roommate. When Wilhelmina's condition improved, she was moved to a less restrictive unit within Park Vista, but Ron felt it was not working for her.

On April 8, 2002, Wilhelmina moved to Imperial Park Senior Care Center, which provided Wilhelmina with assistance in bathing, dressing, and other activities. However, Wilhelmina was left alone at night at Imperial Park. On May 18, 2002, Wilhelmina broke her hip after falling on her way to breakfast. She underwent hip surgery at Whittier Hospital and was transferred to Southland Care Center after her discharge. Wilhelmina returned to Imperial Park on August 12, 2002.

In Case No. VP009089, Marileen and her husband filed a petition to be appointed as temporary conservators of Wilhelmina's person and estate on August 13, 2002.[3] The petition proposed to move Wilhelmina back to Park Vista. It alleged:

> "The proposed conservatee, Wilhemina [*sic*] Osinga, hereinafter referred to as 'my mother,' is 82 years of age is suffering from Alzheimer's/dementia disease and is recovering from surgery to repair a fractured hip. My mother is heavily medicated and confined to her bed or tied to a wheel chair [*sic*]. My sister Jeanette Bjerken I believe is my mother's agent acting under a Power of Attorney procured by my sister at time when my mother was not competent. My sister has commingled my mother's assets with her own and has used those assets for her

---

[3] No appeal was taken from the conservatorship proceedings. However, the trial court admitted evidence from that case into this matter.

own purposes. My sister refuses to discuss any matters relating to my mother's health, or finances. Pursuant to the Power of Attorney my sister, Jeanette Bjerken, has control of all of my mother's assets. My mother does not know where she is nor the reason for her stay in the Southland Care Center. Notice to my mother would serve not any purpose and notice to Jeanette Bjerken is likely to result in concealment of, or loss to my mother's estate."

At a hearing on August 26, 2002, all parties were present and represented by counsel, including Wilhelmina. William Poindexter, the attorney who drafted Wilhelmina's trust documents, represented Jan, Ron, and Carileen. A Probate Volunteer Panel (PVP)[4] attorney was appointed to represent Wilhelmina. The probate court heard testimony from Ron, Jan, and Marileen. Jan testified that all of Wilhelmina's assets and income were transferred to the trust and her medical and living expenses paid from it.

Marileen testified she was dissatisfied with the care received by Wilhelmina at Imperial Park because Wilhelmina was not provided 24-hour care there. Instead, she had access to two emergency buttons, one of which was broken. When Marileen pressed the button, it took an attendant 35 minutes to answer the call because she was busy with another resident. Marileen also noted that Wilhelmina was not signed up for physical therapy or made to use her leg brace.

The probate court appointed Marileen and her husband to be temporary conservators of the estate with authority to marshal assets not already in the trust. The court refused to appoint a conservator of the person and put the matter over to September 11, 2002. It also ordered no assets be dispersed from the trust except for $3,500 per month for Wilhelmina's care. The power of attorney to make medical decisions remained in full force and effect. On September 11, the parties appeared and advised the trial court there was a settlement agreement in place. The parties agreed Jan and Ron

---

**4** The PVP provides a pool of private attorneys from which the probate court may select counsel to represent a conservatee. (*Conservatorship of Gregory D*. (2013) 214 Cal.App.4th 62, 65, fn. 1; Prob. Code, § 1470, subd. (a); Super. Ct. L.A. County, Local Rules, rule 4.123.)

would become co-trustees of the trust, replacing Wilhelmina. Additionally, Ron would be appointed temporary conservator of the person of Wilhelmina and file a petition to become the permanent conservator within 10 days, upon which both Marileen's and Carileen's petitions[5] would be withdrawn. Marileen testified she did not recover any assets outside of the trust. The parties agreed there was no accounting necessary at that time and that Ron would take all steps necessary to provide equal access to Wilhelmina's medical records to all of the children.

Letters were issued appointing Ron as the temporary conservator to Wilhelmina's person on October 17, 2002, to expire December 17, 2002. Jan, however, continued to make the medical decisions for Wilhelmina. She asked Poindexter for clarification on her status. On September 18, 2002, he advised her that her authority under the health care directive was still in effect. He concluded, "The designation of Ron having health powers was required by the act of appoint[ing] him as conservator. However, this is probably not effective since the health power is free of judicial intervention."

Marileen petitioned the court to remove Ron as the conservator of Wilhelmina's person on June 4, 2003, on the grounds he failed to take the necessary steps to allow her to access Wilhelmina's medical records and he allowed Jan continuing authority to make medical decisions for Wilhelmina. On July 21, 2003, Ron told Marileen that Wilhelmina had suffered a stroke and had been admitted to Whittier Hospital. Marileen went to visit Wilhelmina at the hospital with her husband and son. While at the hospital, Carileen hit Marileen in the neck, requiring medical care. Wilhelmina was on a ventilator and Jan spoke with Ron, who was in Utah at the time, about the gravity of their mother's condition. He agreed to remove her from the ventilator. A letter signed by Ron, Jan, and Carileen to Whittier Hospital requested Wilhelmina be removed from life support: "Mrs. Osinga's Health Directives were ignored and she was placed on a ventilator after a massive stroke that affected the brain and brain stem. [¶] Two doctors have checked her

---

**5** Carileen supported Jan remaining Wilhelmina's decision maker. However, she submitted a petition to become the conservator of Wilhelmina's person and estate in the event the probate court determined neither Ron nor Jan were eligible.

and have given a dim prognosis due to damage from the stroke and to her respiratory system as well." Wilhelmina died on July 27, 2003.

In a report submitted on August 15, 2003, Wilhelmina's PVP attorney informed the probate court of Wilhelmina's death and asked to be released from the matter. The PVP attorney also reported Ron revised the Letters of Conservatorship to allow Jan to continue to make medical decisions for Wilhelmina through her previously executed advance health care directive. Because this was contrary to the settlement reached between the parties, the PVP attorney refused to approve those letters. As a result, permanent letters were never approved and the temporary conservatorship expired in December 2002. Because all parties were extremely interested in Wilhelmina's care, however, "if the parties were willing to go along without a conservator of the person, there was no point in insisting that the matter be resolved."

The present case No. VP009145, relating to the trust matters, commenced when the probate court ordered Ron and Jan to succeed Wilhelmina as co-trustees in September 2002. After Wilhelmina's death, a stipulation pursuant to mediation was completed in case No. VP009145 on March 9, 2004. All four siblings agreed to list Wilhelmina's residential and commercial property for sale. They also agreed on a distribution plan for Wilhelmina's personal effects and to permit Marileen and her attorney to inspect the trust's records. A final distribution and accounting of the trust would be subject to the approval of all the beneficiaries, i.e., the siblings.

On March 27, 2007, however, the parties were again before the probate court. Marileen argued that the March 9, 2004 stipulation was no longer binding because certain terms were not fulfilled, such as her ability to retrieve Wilhelmina's medical records. The trial court rejected her contentions, holding that damages or surcharges were appropriate remedies for any breach of the stipulation, as opposed to recission of the entire agreement. The trial court approved the first and second accounts of the trustees and ordered all parties to comply with the terms of the stipulation.

6

On November 16, 2009, Marileen filed a petition in this case seeking forfeiture of Ron and Jan's interest in the trust estate and an order surcharging the distributive share interests of Ron, Jan, and Carileen in the trust estate for breach of fiduciary duties. Ron, Jan, and Carileen cross-complained against Marileen, seeking attorney fees for defense of the petition. The siblings also sought to revoke Marileen's share of the trust assets on the ground her petition violated the no contest clause contained in the trust agreement. These claims were heard in a bench trial beginning May 7, 2012. The trial court issued its judgment on December 10, 2012, denying Marileen's request for forfeiture and awarding attorney fees and costs to her siblings pursuant to their cross-complaint. Marileen timely appealed.

## DISCUSSION

Marileen's appeal does not seek to overturn the entire judgment. Instead, her appeal is solely directed against that part of the judgment which reduces her trust distribution for payment of the legal fees and costs incurred by her siblings in defending against her petition for forfeiture. Marileen challenges the trial court's finding that she filed her petition for forfeiture in bad faith and for the sole purpose of harassing her siblings. Her argument is essentially that the trial court's determinations are unsupported by substantial evidence, and we find it unpersuasive.

## I.     Standard of Review

In reviewing the sufficiency of the evidence, this court is guided by well-settled principles. "[The] power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings. (*Crawford v. Southern Pacific Co*. (1935) 3 Cal.2d 427, 429; *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving [him] the benefit of every reasonable inference and resolving all conflicts in [his] favor . . . ." (*Jessup Farms,* at p. 660.) With these familiar principles in mind, we examine each of the challenged findings.

## II.    Petition for Forfeiture and Surcharge

In her petition for forfeiture, Marileen argued that Ron and Jan had forfeited their share of the trust distribution because their actions hastened Wilhelmina's death and violated Probate Code sections 250, 259 and 4743.  Probate Code section 250 prohibits a person who "feloniously and intentionally kills" the decedent from receiving any of the decedent's property.  Probate Code section 259 deems a person to have predeceased a decedent and restricts his right to recover on a decedent's estate if:  "(1) It has been proven by clear and convincing evidence that the person is liable for physical abuse, neglect, or financial abuse of the decedent, who was an elder or dependent adult.  [¶] (2) The person is found to have acted in bad faith.  [¶]  (3) The person has been found to have been reckless, oppressive, fraudulent, or malicious in the commission of any of these acts upon the decedent.  [¶]  (4) The decedent, at the time those acts occurred and thereafter until the time of his or her death, has been found to have been substantially unable to manage his or her financial resources or to resist fraud or undue influence." "Section 259 does not necessarily eliminate the abuser's entitlement to a share of the estate; it simply restricts the value of the estate to which the abuser's percentage share is applied and prevents that person from benefiting from his or her own wrongful conduct." (*Estate of Dito* (2011) 198 Cal.App.4th 791, 804.)  Probate Code section 4743 subjects a person to prosecution for unlawful homicide if he or she alters or forges an advance health care directive with the intent to withdraw the care necessary to keep the patient alive and hasten the death of the decedent.

In support of her petition, Marileen alleged Ron acted to prevent the release of Wilhelmina's medical records and allowed Jan to continue making health care decisions for Wilhelmina contrary to their agreement that Ron become Wilhelmina's conservator. Marileen further alleged Jan and Carileen "withheld information from Wilhelmina Osinga's various treating physicians which led to her physical deterioration and injury including, but not limited to, placement in an independent living senior care facility, contrary to medical advice, which directly caused Wilhelmina Osinga's fall while unattended and causing a fracture [to] her hip; failed to obtain appropriate medication for

8

Wilhelmina Osinga's medical condition by withholding medical information concerning proper medications prescribed from her treating physicians." Marileen also alleged Jan and Ron violated Probate Code section 4743 by withholding knowledge of the health care power of attorney with the intent to cause the withdrawal of health care necessary to keep Wilhelmina alive contrary to her desires, and medical advice, which hastened her death. In short, Marileen alleged Ron and Jan's decision to remove life support was not authorized and contrary to the order of the court and physicians' advice. As a result, their actions caused Wilhelmina's death.

Marileen also sought an order surcharging Ron, Jan, and Carileen's share of the trust because they breached the March 9, 2004 stipulation by: "(1) Objecting to Petitioners' access to the records of Imperial Park, (2) Failing to provide[] evidence in the form of checks and check registers evidencing when they as Trustees first began to sign checks and, (3) Fail[ing] and refus[ing] to comply with the formula as set forth in Paragraph 4 [which specified how to distribute Wilhelmina's personal property to the beneficiaries] but instead arbitrarily selected the items of personal property to be distributed to the Petitioner." Marileen further accused Jan of giving Wilhelmina's valuable 1930's Indian motorcycle to her son and then lying to Marileen that it was missing. Marileen also objected to the fourth and final accounting, which was consolidated with the forfeiture and surcharge petition.

### III.  Probate Court's Ruling

The probate court rejected all of Marileen's allegations, finding they lacked credible support. It instead found "the evidence clearly established that the medical treatment [Wilhelmina] received was appropriate and above the normal standard of care. No credible evidence was presented that the treatment and care received by the Decedent by the various doctors, hospitals or care facilities fell below any community standard." As to the decision to remove Wilhelmina from life support, the trial court found the "decision was based on the medical advice of the doctors[,]" who determined that Wilhelmina was in "an irreversible coma." Because Wilhelmina had made it clear she did not want her life to be artificially prolonged when she had an incurable and

9

irreversible condition which would soon lead to her death, "[w]hen the decision was made to remove the ventilator and extubate the Decedent, the doctors, [Jan, Ron, and Carileen] were merely car[rying] out the stated desires of the decedent." As a result, the trial court found Marileen had failed to establish a violation of either Probate Code section 259 or 250.

The probate court further found Marileen failed to establish a violation of Probate Code 4743. Instead, the probate court found Ron, Jan, and Carileen to be immune from liability under Probate Code section 4741 because they made healthcare decisions in good faith while acting under the terms of Wilhelmina's health care directive. The court also found Marileen's petition did not violate the "no contest" clause of the trust. The court, however, ordered Marileen's share of the trust to be reduced by the amount of attorney fees and costs incurred by the three siblings in defending her petition. It found Marileen's petition for forfeiture was brought in bad faith and for the purpose of harassing her siblings. The probate court found Marileen "failed to present any credible evidence to support any of the allegations contained in her Petition." To that end, it awarded $28,600.75 to Jan's attorney, $81,740.74 to Ron's attorney, and $94,078.83 to Carileen's attorney.

## IV.    Analysis

Marileen concedes that the "major facts" of this case are not in serious dispute. However, she contends these major facts do not support the four findings which underlie the trial court's award of attorney fees and costs. They are:

> "6.  No credible evidence was presented that [Ron, Carileen and Jan] were reckless, oppressive, fraudulent or malicious in their actions.
> "[¶] . . . [¶]
> "10.  It was the belief of all parties that the decedent's Durable Power of Attorney for Healthcare and a Declaration concerning Medical Treatment that she signed on August 16, 2000 was in full force and effect when the decedent was in Whittier Hospital in July, 2003.
> "[¶] . . . [¶]

10

"12. There was no credible evidence that [Ron, Carileen and Jan's] actions were unlawful.

"[¶] . . . [¶]

"24. [Marileen's] petition for forfeiture was brought in bad faith and for the sole purpose of harassing [her siblings] and causing unnecessary delay."

Even if we accept that these are the four crucial factual findings upon which the attorney fee award is based, substantial evidence supports each of these challenged findings. While the siblings may have acted poorly towards one another, there was no evidence to demonstrate that Ron, Carileen, or Jan were reckless, oppressive, fraudulent or malicious in their actions as to Wilhelmina.

Instead, the record shows they made decisions based on medical advice and subject to Wilhelmina's wishes, as expressed by her advance health care directive. Marileen does not argue on appeal that the advanced health care directive did not accurately reflect Wilhelmina's wishes with respect to her end of life care. Marileen concedes, "there was never any question that Wilhelmina executed this document, or any of the associated papers (Durable Power of Attorney for Health Care and Declaration of Trust). Nor was there ever any doubt about what they provided." Wilhelmina's long-time cardiologist testified that the neurologist's notes regarding Wilhelmina after her stroke showed she had a "poor" prognosis due to a large hemorrhage and history of Alzheimer's. The cardiologist explained Wilhelmina had a "massive bleed" in her brain stem, "a very sensitive, very important structure responsible really for every life function you have." He considered her to be in a vegetative state and she would likely not regain consciousness. According to the hospital records, three physicians concurred that her prognosis was poor.

Marileen attempts to expand the court's findings to include the siblings' interactions with her, pointing out, for example, that Carileen's physical assault on her in the hospital was "unlawful." This action, however, does not implicate the Probate Code sections which Marileen alleged her siblings violated. Each of the Probate Code sections in question relate to actions dealing with Wilhelmina. As a result, Ron, Jan, and

11

Carileen's alleged misrepresentation to the hospital that there were "no disagreements or conflicts between any surrogate decision-makers" does not implicate Probate Code sections 250, 259, or 4743. Marileen argues the siblings committed fraud on the probate court when Ron allowed Jan to continue to make healthcare decisions for Wilhelmina after he was appointed temporary conservator. Again, this conduct does not implicate the Probate sections identified. Moreover, Marileen admits "this alone would not serve to justify Marileen filing her Petition for Forfeiture . . ."

Neither has Marileen presented any basis for forfeiture or surcharge from Ron's purported attempts to prevent her from receiving Wilhelmina's medical records. Instead, the record shows those records were delivered to her attorney starting in March 2004. In January 2003, Ron signed an authorization to release Wilhelmina's records to Marileen. In late 2003, Ron and Jan's attorney submitted a stipulation for waiver of objections to the service of subpoenas by Marileen for medical records from Wilhelmina's providers. Beginning January 2004, copies of Wilhelmina's medical records were provided to Marileen by Park Vista, Imperial Park, Whittier Hospital, Dr. Bruce Vannata, Southland Care Center, Dr. James Weiss, Long Beach Memorial Hospital, and Dr. Christopher Holden. The handwritten notes in the margins of the confirmation letters show thousands of pages were sent to Marileen. Marileen admitted at trial she received documents from Wilhelmina's medical providers in January 2004.

In sum, Marileen has identified no evidence, and there appears to be nothing in the record, to show that Ron, Jan, or Carileen feloniously and intentionally killed Wilhelmina in violation of section 250, committed elder abuse in violation of section 259, or forged Wilhelmina's health care directive in violation of section 4743.

Substantial evidence also supports the probate court's finding that all parties believed Wilhelmina's August 2000 durable power of attorney for healthcare naming Jan as her attorney-in-fact was in full force and effect at the time she was admitted to the hospital shortly before her death in July 2003. Marileen admitted at trial that she knew in May 2003 that Jan had continued to make healthcare decisions for Wilhelmina and Ron had not. Indeed, Marileen submitted a declaration which stated that, "[b]y not seeking

12

the issuance of the Letters of Conservatorship, Ronald Osinga, as Conservator of the Person, is allowing, by default, the Advanced Health Care Directive appointing his sister, Jan Bjerken, as agent, to exist as the operative document concerning the care of the Conservatee's medical and health care."

All of the above supports a finding that Marileen brought her petition for forfeiture in bad faith. In *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328, minority trust beneficiaries objected to the sale of real property by the trustee. The probate court found their objections were made in bad faith and were timed to prevent the sale from closing by the due date. (*Id.* at p. 1332.) The probate court also awarded attorney fees incurred by the trustees, to be taken from the objectors' share of the trust distribution. The objectors argued the attorney fees should be borne by the entire trust rather than just from their share. The Court of Appeal affirmed the attorney fee award, holding that such an order is authorized under the probate court's equitable powers. Citing to *Conley v. Waite* (1933) 134 Cal.App. 505, it held that " 'when an unfounded suit is brought against [the trustee] by the *cestui que trust*, attorney's fees may be allowed him in defending the action and may be made a charge against the interest in the estate of the party causing the litigation.' " (*Rudnick, supra,* at p. 1334.)

Similarly, in *Estate of Ivey* (1994) 22 Cal.App.4th 873, a beneficiary objected to the trustee's third accounting of the trust. The probate court found the beneficiary's objections to be meritless and awarded sanctions against the beneficiary as well as attorney fees incurred by the trustee and the other beneficiaries to the trust. (*Id.* at p. 878.)

As in *Rudnick* and *Estate of Ivey,* Marileen's petition was unfounded and meritless. Marileen contends she filed her petition for forfeiture "in the honest belief that her mother had died prematurely, and that her siblings were responsible." Marileen's petition was filed on November 16, 2009, six years after Wilhelmina's death and five years after she began to receive Wilhelmina's medical records showing the doctors all agreed Wilhelmina's prognosis was "poor." There was no credible evidence presented over a six-day trial to support any of her allegations against her siblings. Accordingly,

13

the probate court was well within its authority to order the siblings' attorney fees and costs to be paid from Marileen's portion of the trust distribution.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.


                                                    BIGELOW, P.J.

We concur:


        RUBIN, J.



        FLIER, J.